UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENT SHIPP, et al., <br> Plaintiffs, <br> v. <br> LIBBY SCHAAF, et al., <br> Defendants. | Case No. 19-cv-01709-JST <br><br> **ORDER RE: MOTION FOR PRELIMINARY INJUNCTION** <br> Re: ECF No. 7 |

Before the Court is Plaintiffs Brent Shipp and Eric De Guzman's motion for a preliminary injunction. ECF No. 7. The Court will deny the motion.

## I. BACKGROUND

The City of Oakland has enacted ordinances recognizing "that a shelter crisis exists due to a 'significant number of persons . . . without the ability to obtain shelter, resulting in a threat to their health and safety.'" ECF No. 1-2 (February 13, 2019 memo from City Council President Rebecca Kaplan) at 1. As part of its response to this crisis, the City's Public Works Department has a Standard Operating Procedure ("S.O.P.") regarding the removal of homeless encampments from public rights-of-way, parks, and City-owned property. ECF No. 1-2 at 10. The S.O.P. contemplates that sometimes the belongings of occupants will be removed when encampments are cleared, and states that the S.O.P.'s "guidelines must be followed to protect the constitutional rights of persons whose personal property remains at these locations." *Id.* As relevant here, the required procedures include the following:

- A Notice to Vacate will be posted "in multiple visible locations at the area" at least 72 hours prior to the closure.

- "City personnel shall not prevent occupants from retrieving their belongings before

vacating the encampment site."

- "City personnel shall not confiscate or remove belongings from site when the occupant is present, absent a reasonable belief that the belongings are an immediate threat to public health and safety or are evidence of a crime or contraband."
- "[The Public Works Agency] shall itemize the belongings collected and include the location, date, and time of collection on the itemization form."
- There is an exception to the previous paragraph for "belongings that are considered to be clearly trash or are unsafe for storage, such as food or food wrappers, soiled items, or used personal hygiene items." Public works employees are directed to "immediately dispose of" such items.
- "A 'Notice of Collected Property' will be posted where the original 'Notice to Vacate' was previously posted, and will contain the [Public Works Agency] Call Center telephone number."
- Public Works will store the collected belongings at a Public Works facility for at least ninety (90) days.

ECF No. 14-2 at 16-17.

The S.O.P. governs both permanent encampment closures and temporary "clean and clear" operations, after which encampment residents are permitted to return to living at the site. ECF No. 14-1 at 4-5.

Plaintiffs Shipp and De Guzman are currently unhoused and live in an encampment located at East 12th Street and 16th Avenue in the City of Oakland. They have lived in encampments in other locations in the City from which they were evicted and their belongings seized. They allege that the City violates its own policy by disposing of unhoused persons' belongings improperly. They "want the City of Oakland to follow their so called policy and stop throwing away people's belongings . . . [and] do the job they are paid to do & bag, tag and & store our belongings for 90 days." ECF No. 1 at 5. They contend that the City's actions violate their constitutional rights under the Fourth, Eighth, and Fourteenth Amendments.

On March 29, 2019, the Department of Public Works posted a notice that public works

crews would "temporarily close the encampment" in the median on East 12th Street from 14th to 19th Avenues "between the hours of 8 AM and 4 PM" on Wednesday, April 3, 2019, or on the next business day, "to clean the site thoroughly." ECF No. 3 at 3. The notice further cautioned that "[a]ny property left at this site at the time of cleanup will be removed from the site and stored by Public Works. Property that is unsafe or hazardous to store will be discarded immediately." *Id.*

Plaintiffs filed this pro se action on April 2, 2019, and immediately moved for a temporary restraining order and a preliminary injunction to prevent this temporary closure. ECF Nos. 1, 3, 7. Given the imminence of the closure, the Court issued a temporary restraining order on an *ex parte* basis that evening, enjoining the City from vacating Plaintiffs' encampment for 14 days. ECF No. 11 at 5. The Court further ordered the City to show cause why a preliminary injunction should not issue. *Id.* at 5-6. The City filed its response on April 8, 2019, ECF No. 14, and Plaintiffs did not file a reply. At the hearing on April 16, 2019, Plaintiff De Guzman appeared on his own behalf and offered testimony and argument.

## II. LEGAL STANDARD

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

To grant preliminary injunctive relief, a court must find that "a certain threshold showing [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam). Assuming that this threshold has been met, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

3

1135 (9th Cir. 2011) (internal quotation marks omitted).

**III.     ANALYSIS**

    **A.     Likelihood of Success on the Merits**

        **1.     Eighth Amendment**

Plaintiffs contend that the City's practices violate their Eighth Amendment rights under *Martin v. City of Boise*, No. 15-35845, -- F.3d --, 2019 WL 1434046, at *15 (9th Cir. Apr. 1, 2019).

The Eighth Amendment's "Cruel and Unusual Punishments Clause circumscribes the criminal process in three ways." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977). "First, it limits the type of punishment the government may impose; second, it proscribes punishment 'grossly disproportionate' to the severity of the crime; and third, it places substantive limits on what the government may criminalize." *Martin*, 2019 WL 1434046, at *26. At issue here is the third limitation, which the Supreme Court has cautioned must "be applied sparingly." *Ingraham*, 430 U.S. at 667.

In *Martin*, the Ninth Circuit synthesized the relevant case law as articulating "the principle . . . 'that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being.'" *Martin*, 2019 WL 1434046, at *27 (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1135 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007)). Applying this principle to a pair of ordinances that "criminalize[d] the simple act of sleeping outside on public property" anywhere in the city of Boise, the Ninth Circuit explained that, "as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Id.* at *27-28. In so doing, the Ninth Circuit emphasized that its holding was "a narrow one":

> Naturally, our holding does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it. Nor do we suggest that a jurisdiction with insufficient shelter can never criminalize the act of sleeping outside. Even where shelter is unavailable, an ordinance prohibiting sitting, lying, or sleeping outside at particular times or in particular locations

4

> might well be constitutionally permissible. So, too, might an ordinance barring the obstruction of public rights of way or the erection of certain structures. Whether some other ordinance is consistent with the Eighth Amendment will depend, as here, on whether it punishes a person for lacking the means to live out the "universal and unavoidable consequences of being human" in the way the ordinance prescribes.

*Id.* at *27 n.8 (citations omitted).

*Martin*'s holding does not extend to the situation here. First, the City's decision to require Plaintiffs to temporarily vacate their encampment does not, by itself, implicate any criminal sanctions that would trigger Eighth Amendment protections. Nothing in the notice of temporary closure or elsewhere in the record suggests that the City intends to issue criminal sanctions as part of the temporary closure operation.

Rather, it appears from Plaintiffs' motion that the criminal sanction they fear is a citation or arrest for failing to vacate the encampment. ECF No. 7 at 4-5. The Court notes that there is no evidence in the record that the City has previously enforced temporary enclosures via citations or arrests. However, even assuming (as Plaintiffs do) that this might occur, remaining at a particular encampment on public property is not conduct protected by *Martin*, especially where the closure is temporary in nature. The Ninth Circuit was clear: "[W]e in no way dictate to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Martin*, 2019 WL 1434046, at *27 (alteration in original) (quoting *Jones*, 444 F.3d at 1138). This is not a case where "homeless plaintiffs do not have a single place where they can lawfully be" within the City. *Id.* (quoting *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1565 (S.D. Fla. 1992)). Faced with a similar motion seeking to enjoin the City on this basis, another court in this district has explained, "Plaintiffs are not faced with punishment for acts inherent to their unhoused status that they cannot control." *Miralle v. City of Oakland*, No. 18-CV-06823-HSG, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018). The same is true here.

Because the temporary closure does not impose criminal consequences – even indirectly – in a manner prohibited by *Martin*, the Court need not find that Plaintiffs would have the "option of sleeping indoors" during this eight-hour period. *Martin*, 2019 WL 1434046, at *27; *see also*

5

*Miralle*, 2018 WL 6199929, at *2.

Accordingly, the Court concludes that Plaintiffs have not raised serious questions as to their Eighth Amendment claim.

### 2. Fourteenth Amendment

Plaintiffs next assert that an injunction is necessary because – contrary to its official policies – the City "has a pattern and practice of 'unlawfully seizing and destroying personal property that is not abandoned without providing any meaningful notice and opportunity to be heard.'" ECF No. 7 at 6 (quoting *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027 (9th Cir. 2012)).

In *Lavan*, the City of Los Angeles "admit[ted] that it failed to provide any notice or opportunity to be heard for [unhoused plaintiffs] before it seized and destroyed their property." 693 F.3d at 1032. Los Angeles argued only that plaintiffs lacked a "constitutionally protected property interest in unattended personal property left illegally on the public sidewalk," *id.* at 1031, a suggestion that the Ninth Circuit rejected.

Here, as the *Miralle* court recognized, the S.O.P. "on its face, provides adequate notice and opportunity for Plaintiffs to be heard before property is seized." *Miralle*, 2018 WL 6199929, at *3; *see also Cobine v. City of Eureka*, No. C 16-02239 JSW, 2016 WL 1730084, at *4 (N.D. Cal. May 2, 2016) (finding similar procedures "provided sufficient due process through advance notice and will provide adequate post-seizure remedies"). The notice of temporary closure was posted on March 29, 2019, more than 72 hours before the morning of April 3, 2019. ECF No. 14-2 at 45. The notice warned occupants to remove all belongings; in the alternative, the City stated that it would store property left at the encampment, so long as it was not "unsafe or hazardous to store." *Id.* Under the S.O.P., belongings are stored for at least 90 days, and a Notice of Collected Property is posted at the encampment with information on how to retrieve stored property. ECF No. 14-2 at 16.

At the hearing, Plaintiffs confirmed that their Fourteenth Amendment challenge is not to the S.O.P. itself. Rather, Plaintiffs contend that the City does not actually comply with the S.O.P. and is therefore unlikely to comply with it in the future. If the record contained evidence that the

City had repeatedly violated its own policies regarding the destruction of unhoused persons' property, it would raise serious questions as to the merits of Plaintiffs' claim. However, the declarations submitted by Plaintiffs are too general to meet this burden.

It is not sufficient to state, as Plaintiffs and their declarants do, that the City has sometimes removed and destroyed encampment members' property. Sometimes the City has the right to do this. The S.O.P. permits City personnel to "confiscate or remove belongings . . . [that] are an immediate threat to public health and safety or evidence of a crime or contraband." ECF No. 14-2 at 17. Plaintiffs do not challenge these provisions, or the S.O.P.'s guidelines concerning the types of items that the City stores versus those it confiscates and destroys. *Id.* at 21.[1] Therefore, when the City confiscates and destroys property, it is not possible to conclude that there has been a policy violation without knowing more.

Plaintiffs' declarations do not provide the "more." Two declarants, Jesse Turner and Angel Diaz, both state that they witnessed the City improperly discard encampment residents' belongings during closures, but do not provide any specific details from which the Court can infer that the discarded items should have been stored instead. *See* ECF No. 6-2 at 2; ECF No. 6-3 at 2-3. It is equally possible that the items in question were properly seized and destroyed because they were unsafe, hazardous to store, or a threat to public health or safety, as it is that they were not. Plaintiffs simply do not address that question.[2] And though Shipp and De Guzman report that similar destruction occurred when the City closed their prior encampment on East 12th Street and 23rd Avenue, their evidence is similarly too general for the Court to find that the City violated

---

[1] Pursuant to the City's guidelines, the Public Works Agency does not store items that are, among other things, "dirty or soiled," "perishable," "contaminated," or "hazardous." ECF No. 14-2 at 21. It also does not store bedding, pots and pans, or books. *Id.*

The Court notes as well that, to the extent that encampment residents disagree with the City's decisions about which items can be stored, they have at least 72 hours to remove all items under the City's policies.

[2] Plaintiffs' declarants do identify some purportedly destroyed items that are on the City's presumptive storage list. *See, e.g.*, ECF No. 6 at 3 (stereo system); ECF No. 6-1 at 2 (electronics, bicycles). Nonetheless, the items may have been in a condition that subjected them to seizure under the City's policies. *See* note 1, *supra*. Again, the declarations are silent on this point.

7

its policies in that instance. ECF No. 6 at 2-3; ECF No. 6-1 at 2.[3] Against this evidence, the Court weighs the City's representations that it has consistently complied with its policies, either by properly storing items or cooperating with encampment residents to remove all items that should not be discarded. *See* ECF No. 14-2 at 5-6. Because the Plaintiffs' declarations are so general, there is nothing to contradict the City's representations.

"To have standing to assert a claim for prospective injunctive relief, a plaintiff must demonstrate 'that he is realistically threatened by a repetition of [the violation].'" *Melendres v. Arpaio*, 695 F.3d 990, 997 (9th Cir. 2012) (alteration in original) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). Where the threat of harm is not attributable to a written policy, plaintiffs must generally "demonstrat[e] that the injury was part of a pattern of officially sanctioned behavior." *Allen v. County of Lake*, 71 F. Supp. 3d 1044, 1050 (N.D. Cal. 2014) (citing *Melendres*, 695 F.3d at 997-98). In order to obtain a preliminary injunction, moreover, "plaintiffs must make a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). Because Plaintiffs have not met their burden of showing that the City is violating its own policies, the Court cannot find a realistic threat that it will do so in the future.

Discovery in this case regarding the City's past conduct, or evidence concerning future "clean and clear" operations, may succeed in demonstrating that the City does not, in fact, comply with its own policies. The Court will consider such evidence if it emerges. On the present record, however, Plaintiffs have not met their burden of showing either a serious question going to the merits or a likelihood of future harm. Given those failures, the Court need not address the remaining factors. The Court will deny the motion for preliminary injunction.

///

///

///

///

///

---

[3] At the Court's invitation, De Guzman also gave testimony at the hearing on the motion. Though the Court considers that testimony, it does not provide material support for Plaintiffs' claims.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is denied.

**IT IS SO ORDERED.**

Dated: April 16, 2019

_____
JON S. TIGAR
United States District Judge